IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| Overseas Shipholding Group, Inc., et al., | : | |
| | : | Case No. 12-20000 (PJW) |
| Debtors | : | Jointly Administered |
| _____ | : | |
| OVERSEAS SHIPHOLDING GROUP, INC., | : | |
| | : | |
| Plaintiff, | : | |
| vs. | : | Adv. No. _____ |
| | : | |
| ALAN P. PARNES, RICHARD H. ROWE, | : | |
| PETER G. SAMUELS, STEVEN O. WEISE, | : | |
| and PROSKAUER ROSE, LLP, | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

## ADVERSARY COMPLAINT AND DEMAND FOR JURY TRIAL

**OVERSEAS SHIPHOLDING GROUP, INC.** ("Plaintiff" or "OSG" or

"theCompany"), as Plaintiff and debtor-in-possession in these Chapter 11 proceedings, by and

through its attorneys, files this Adversary Complaint against **Proskauer Rose, LLP**

("Proskauer"), **Alan P. Parnes** ("Parnes"), **Richard H. Rowe** ("Rowe"), **Peter G. Samuels**

("Samuels"), and **Steven O. Weise** ("Weise"). Parnes, Rowe, Samuels and Weise are sometimes

referred to collectively herein as the "Individual Defendants." Proskauer, Parnes, Rowe,

Samuels and Weise are sometimes referred to collectively herein as the "Defendants."

## I. Introduction

1. This is a legal malpractice and breach of fiduciary duty case against Proskauer,

OSG's general outside counsel, and four (4) of Proskauer's individual partners. In 2011 and

2012, Proskauer repeatedly advised OSG's management that (i) the Company's unsecured credit

agreements, which expressly provided that OSG and its two subsidiaries, OSG International, Inc.

("OIN") and OSG Bulk Ships, Inc. ("OBS"), were jointly and severally liable for all principal and interest due thereunder, did not render OIN jointly and severally liable for the borrowings of OSG under the credit agreements; (ii) borrowings by OSG under the credit agreements would not have any adverse U.S. tax consequences to OSG; and (iii) it was not necessary for OSG's management to disclose the potential tax issue regarding the Company's unsecured credit agreements to OSG's Board of Directors, Audit Committee, independent auditors, regulators, or the public.

2.      In reliance on Proskauer's advice, OSG continued to borrow hundreds of millions of dollars under its existing unsecured credit agreement under the mistaken assumption it could do so without incurring any incremental U.S. income tax liability.  In addition, based on Proskauer's advice that there was no tax issue and no disclosure was necessary, OSG's management made no disclosure of any possible tax issue with the Company's unsecured credit agreements to OSG's Board of Directors, Audit Committee, independent auditors, or the SEC until September 2012.

3.      Contrary to Proskauer's advice, the joint and several structure of OSG's credit agreements resulted in significant negative tax consequences to OSG.  As a result of the joint and several structure, every time OSG borrowed money under one of the credit agreements, the amount borrowed was deemed to be a distribution by OIN to OSG to the extent of OIN's otherwise current or accumulated untaxed foreign shipping income and to the extent the amount of such borrowings, together with any other investments by OIN in U.S. property, exceeded the balance of OIN's previously taxed income.  Each such deemed distribution was then subject to

U.S. income taxation under Section 956 of the Internal Revenue Code of 1986.[1]  Accordingly,

OSG unwittingly became obligated to pay hundreds of millions of dollars of otherwise

completely avoidable U. S. income taxes.

4.    In addition, on the basis of Proskauer's advice, OSG's management did not

disclose the potential tax issue in any of its public filings with the SEC.  Moreover, because of

Proskauer's advice that it also was not necessary for OSG's management to disclose the potential

tax issue to OSG's Board, Audit Committee, independent auditors, or the SEC, the Board was

deprived of the opportunity to assess the issue for itself until advised of it for the very first time

on September 20, 2012.

5.    Proskauer served as OSG's general outside counsel for over 30 years.  In 1994

and 1997, Proskauer represented OSG in drafting credit agreements that expressly imposed only

several liability on OSG and its two subsidiaries, OIN and OBS.  Under these agreements, OBS

and OIN were liable for repayment of only the monies they each borrowed, and OBS and OIN

were not jointly liable to the lenders for OSG's borrowings.

6.    In 2000, Proskauer represented OSG in drafting and negotiating a new credit

agreement.  That new credit agreement, unlike the prior agreements, imposed joint and several

liability on OSG's overseas subsidiary, OIN, (as well as OBS) for all of OSG's borrowings.

Thus, under this new agreement, OIN, OBS and OSG were each liable to the lenders for all of

OSG's borrowings  Thus if OSG declined or was unable to repay its debts, or the lenders simply

chose to pursue OIN, OIN would be liable for OSG's borrowings under the credit agreements.

All of the Company's credit agreements since 2000, including the 2001 credit agreement on

---

[1]  Unless otherwise indicated, all references in this Adversary Complaint to "Section" refer to the
Internal Revenue Code of 1986, as amended.

which Proskauer advised the Company, have been modeled on the 2000 credit agreement, and hence each of those agreements has provided that OSG, OIN and OBS are jointly and severally liable for all principal and interest due under the credit agreements.

7.    This change in the structure of the credit agreement from "several" to "joint and several" resulted in significant negative tax consequences to OSG.  As a result of the joint and several structure, every time OSG borrowed money under one of the post-1999 credit agreements, the amount borrowed was a taxable distribution to OSG under Section 956 to the extent of OIN's otherwise current or accumulated untaxed foreign shipping income, resulting in hundreds of millions of dollars of otherwise completely avoidable U. S. income tax liability to OSG.

8.    In 2005, Proskauer compounded its previous negligent advice to include the joint and several language in the 2000 and 2001 credit agreements by advising OSG to consolidate all of the untaxed accumulated earnings of OIN's foreign subsidiaries into OIN for tax purposes (the so-called "check-the-box elections"), without first reviewing or having a thorough understanding of OSG's existing credit structure.  This advice had the effect of increasing OSG's Section 956 tax liability exposure for OIN's foreign shipping income and making the tax consequences of Proskauer's inclusion of the "joint and several" language in the credit agreements beginning in 2000 even worse.

9.    Then in 2011, when the adverse consequences of Proskauer's prior negligent advice were first identified as a potential issue, Proskauer actually compounded the problem by advising OSG that the words "joint and several" in the credit agreements did not really mean that OIN, OBS and OSG were each individually liable to the lenders for all of OSG's borrowings; and that, therefore, the language did not result in negative Section 956 tax consequences.

Proskauer professed to be very confident in its advice and advised OSG's management that no disclosure of the issue to OSG's Board of Directors, Audit Committee, independent auditors, regulators, or the public was required. Proskauer also advised OSG's management that it could continue to borrow under the unsecured credit agreements without any adverse tax consequences.

10.     This case arises from Proskauer's (i) failure to recognize the adverse tax effects resulting from the joint and several structure of OSG's credit agreements beginning in 2000 and continuing until 2011; (ii) negligent advice to OSG in 2005 regarding the check-the-box elections for OIN's foreign subsidiaries; (iii) negligent advice to OSG in 2011 and 2012 concerning the interpretation of the credit agreements and the failure to advise on the adverse tax consequences; and (iv) negligent advice to OSG that it was not necessary for management to disclose this tax issue to the Company's Board of Directors, Audit Committee, independent accountants, or in the Company's annual Form 10-K or any of its quarterly filings with the SEC.

11.     These numerous acts and omissions constituting professional negligence and breach of fiduciary duty committed by the Defendants in connection with their engagement by OSG were the direct and proximate cause of the hundreds of millions of dollars of damages to OSG that this lawsuit seeks to recover.

## II. Parties, Jurisdiction and Venue

12.     OSG is a Delaware corporation with its primary place of business at 1301 Avenue of the Americas, 42nd Floor, New York, New York 10019.

13.   On November 14, 2012 (the "Petition Date"), OSG and its subsidiaries filed

voluntary petitions for relief under Chapter 11, Title 11 of the United States Code (the

"Bankruptcy Code").[2]

---

[2] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Overseas Shipholding Group, Inc. (7623); OSG International, Inc. (7117); OSG Bulk Ships, Inc. (2600); 1372 Tanker Corporation (4526); Africa Tanker Corporation (9119); Alcesmar Limited (5306); Alcmar Limited (5307); Alpha Suezmax Corporation (1684); Alpha Tanker Corporation (6063); Amalia Product Corporation (3808); Ambermar Product Carrier Corporation (8898); Ambermar Tanker Corporation (7100); Andromar Limited (5312); Antigmar Limited (5303); Aqua Tanker Corporation (7408); Aquarius Tanker Corporation (9161); Ariadmar Limited (5301); Aspro Tanker Corporation (4152); Atalmar Limited (5314); Athens Product Tanker Corporation (9565); Atlas Chartering Corporation (8720); Aurora Shipping Corporation (5649); Avila Tanker Corporation (4155); Batangas Tanker Corporation (8208); Beta Aframax Corporation (9893); Brooklyn Product Tanker Corporation (2097); Cabo Hellas Limited (5299); CaboSounion Limited (5296); Caribbean Tanker Corporation (6614); Carina Tanker Corporation (9568); Carl Product Corporation (3807); Concept Tanker Corporation (9150); Crown Tanker Corporation (6059); Delphina Tanker Corporation (3859); Delta Aframax Corporation (9892); DHT AniaAframax Corp. (9134); DHT Ann VLCC Corp. (9120); DHT Cathy Aframax Corp. (9142); DHT Chris VLCC Corp. (9122); DHT Rebecca Aframax Corp. (9143); DHT Regal Unity VLCC Corp. (9127); DHT Sophie Aframax Corp. (9138); Dignity Chartering Corporation (6961); Edindun Shipping Corporation (6412); Eighth Aframax Tanker Corporation (8100); Epsilon Aframax Corporation (9895); First Chemical Carrier Corporation (2955); First LPG Tanker Corporation (9757); First Union Tanker Corporation (4555); Fourth Aframax Tanker Corporation (3887); Front President Inc. (1687); Goldmar Limited (0772); GPC Aframax Corporation (6064); Grace Chartering Corporation (2876); International Seaways, Inc. (5624); Jademar Limited (7939); Joyce Car Carrier Corporation (1737); Juneau Tanker Corporation (2863); Kimolos Tanker Corporation (3005); Kythnos Chartering Corporation (3263); Leo Tanker Corporation (9159); Leyte Product Tanker Corporation (9564); Limar Charter Corporation (9567); Luxmar Product Tanker Corporation (3136); Luxmar Tanker LLC (4675); Majestic Tankers Corporation (6635); Maple Tanker Corporation (5229); Maremar Product Tanker Corporation (3097); Maremar Tanker LLC (4702); Marilyn Vessel Corporation (9927); Maritrans General Partner Inc. (8169); Maritrans Operating Company L.P. (0496); Milos Product Tanker Corporation (9563); Mindanao Tanker Corporation (8192); Mykonos Tanker LLC (8649); Nedimar Charter Corporation (9566); Oak Tanker Corporation (5234); Ocean Bulk Ships, Inc. (6064); Oceania Tanker Corporation (9164); OSG 192 LLC (7638); OSG 209 LLC (7521); OSG 214 LLC (7645); OSG 215 Corporation (7807); OSG 242 LLC (8002); OSG 243 LLC (7647); OSG 244 LLC (3601); OSG 252 LLC (7501); OSG 254 LLC (7495); OSG 300 LLC (3602); OSG 400 LLC (7499); OSG America LLC (2935); OSG AmericaL.P. (2936); OSG America Operating Company LLC (5493); OSG Car Carriers, Inc. (1608); OSG Clean Products International, Inc. (6056); OSG Columbia LLC (7528); OSG Constitution LLC (8003); OSG Courageous LLC (2871); OSG
(…Continued)

14.    On November 15, 2012, an order was entered directing the joint administration of all OSG related cases.

15.    Defendant Proskauer Rose LLP is a New York limited liability partnership and law firm with offices, partners and employees throughout the United States and the world.  Its principal place of business is 11 Times Square, New York, New York 10036.  Proskauer may be served with process at its New York office address.

---

(continued…)

Delaware Bay Lightering LLC (4998); OSG Discovery LLC (8902); OSG Endeavor LLC (5138); OSG Endurance LLC (2876); OSG Enterprise LLC (3604); OSG Financial Corp. (8639); OSG Freedom LLC (3599); OSG Honour LLC (7641); OSG Independence LLC (7296); OSG Intrepid LLC (7294); OSG Liberty LLC (7530); OSG Lightering Acquisition Corporation (N/A); OSG Lightering LLC (0553); OSG Lightering Solutions LLC (5698); OSG Mariner LLC (0509); OSG Maritrans Parent LLC (3903); OSG Navigator LLC (7524); OSG New York, Inc. (4493); OSG Product Tankers AVTC, LLC (0001); OSG Product Tankers I, LLC (8236); OSG Product Tankers II, LLC (8114); OSG Product Tankers, LLC (8347); OSG Product Tankers Member LLC (4705); OSG Quest LLC (1964); OSG Seafarer LLC (7498);OSG Ship Management, Inc. (9004); OSG Valour Inc. (7765); Overseas Allegiance Corporation (7820); Overseas Anacortes LLC (5515); Overseas Boston LLC (3665); Overseas Diligence LLC (6681); Overseas Galena Bay LLC (6676); Overseas Houston LLC (3662); Overseas Integrity LLC (6682); Overseas Long Beach LLC (0724); Overseas Los Angeles LLC (5448); Overseas Martinez LLC (0729); Overseas New Orleans LLC (6680); Overseas New York LLC (0728); Overseas Nikiski LLC (5519); Overseas Perseverance Corporation (7817); Overseas Philadelphia LLC (7993); Overseas Puget Sound LLC (7998); Overseas Sea Swift Corporation (2868); Overseas Shipping (GR) Ltd. (5454); Overseas ST Holding LLC (0011); Overseas Tampa LLC (3656); Overseas Texas City LLC (5520); Pearlmar Limited (7140); Petromar Limited (7138); Pisces Tanker Corporation (6060); Polaris Tanker Corporation (6062); Queens Product Tanker Corporation (2093); Reymar Limited (7131); Rich Tanker Corporation (9147); Rimar Chartering Corporation (9346); Rosalyn Tanker Corporation (4557); Rosemar Limited (7974);Rubymar Limited (0767); Sakura Transport Corp. (5625); Samar Product Tanker Corporation (9570); Santorini Tanker LLC (0791); Serifos Tanker Corporation (3004); Seventh Aframax Tanker Corporation (4558); Shirley Tanker SRL (3551); Sifnos Tanker Corporation (3006); Silvermar Limited (0766); Sixth Aframax Tanker Corporation (4523); Skopelos Product Tanker Corporation (9762); Star Chartering Corporation (2877); Suezmax International Agencies, Inc. (4053); Talara Chartering Corporation (3744); Third United Shipping Corporation (5622); Tokyo Transport Corp. (5626); Transbulk Carriers, Inc. (6070); Troy Chartering Corporation (3742); Troy Product Corporation (6969); Urban Tanker Corporation (9153); Vega Tanker Corporation (3860); View Tanker Corporation (9156); Vivian Tankships Corporation (7542); Vulpecula Chartering Corporation (8718); Wind Aframax Tanker Corporation (9562).

16.     Defendant Alan P. Parnes is a partner in Proskauer's New York office.  His law practice focuses primarily on tax matters.  Mr. Parnes served as OSG's primary tax counsel since before 2000.  Mr. Parnes may be served with process at Proskauer's New York office at 11 Times Square, New York, New York 10036.

17.     Defendant Richard H. Rowe is a partner in Proskauer's Washington, D.C. office.  His law practice focuses primarily on corporate governance and regulatory matters.  Mr. Rowe served as OSG's primary SEC disclosure and regulatory counsel.  Mr. Rowe may be served with process at Proskauer's Washington, D.C. office at 1001 Pennsylvania Ave, N.W., Suite 400 South, Washington, D.C. 20004-2533.

18.     Defendant Peter G. Samuels is a partner in Proskauer's New York office.  His law practice includes advising clients on general corporate matters and handling various commercial transactions including mergers and acquisitions.  Mr. Samuels served as the "OSG relationship partner" since 2005.  Mr. Samuels may be served with process at Proskauer's New York office at 11 Times Square, New York, New York 10036.

19.     Defendant Steven O. Weise is a partner in Proskauer's Los Angeles office.  He practices in a variety of corporate and commercial law areas.  Mr. Weise may be served with process at Proskauer's Los Angeles office at 2049 Century Park East, Los Angeles, CA 90067-3206.

20.     This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. Section 1334(b) and 28 U.S.C. Section 157 and Federal Rules of Bankruptcy Procedure 7001 and 7003.  This adversary proceeding relates to the captioned bankruptcy proceeding under Chapter 11 now pending in this Court.  This is a non-core proceeding.  This adversary proceeding is filed in the U.S. Bankruptcy Court in accordance with the provisions of 28 U.S.C.

Section 157(a) and the provisions of the Amended Standing Order of Reference dated February 29, 2012, signed by the Chief Judge of the U.S. District Court for the District of Delaware. OSG intends to file a Motion to Withdraw the Reference with regard to this adversary proceeding at the appropriate time. OSG does not consent to entry of a final judgment by the U.S. Bankruptcy Court and does not waive its right to have this case tried by a jury in the U.S. District Court for the District of Delaware.

21.    Venue is proper in this Court pursuant to 28 U.S.C. Section 1409 because this action relates to a case pending in this District under Title 11 of the Bankruptcy Code.

## III. Background

### A.    OSG

22.    OSG is a world leader in the field of energy transportation. OSG transports bulk crude oil and refined petroleum products throughout the world. The Company has both a United States flag business and an international flag business. The U.S. flag segment is owned by OSG's wholly-owned subsidiary OSG Bulk Ships, Inc. (previously defined as "OBS"), a New York Corporation. OBS and its subsidiaries operate U.S. built and owned ships solely between U.S. ports manned with U.S. crews. The international flag or foreign operation is conducted through OSG's wholly-owned subsidiary OSG International, Inc. (previously defined as "OIN"), which is incorporated under the laws of the Republic of the Marshall Islands. OIN and its subsidiaries operate ships between U.S. and international ports and between international ports. OSG's domestic and international fleet currently consists of 90 of the largest ships afloat. OSG and its subsidiaries maintain offices in North America, Europe and Asia.

### B.    Proskauer

23.    Proskauer is a nationally recognized firm that holds out itself and its attorneys to the public as sophisticated lawyers whose approach to the practice of law "is not simply to

'represent' our clients but to get into their heads; to understand their business and to know their industries as well as they do. We do this so we are not presenting legal advice in a vacuum but rather with the understanding of how it will affect their bottom line. When they grow, we grow. It's called momentum."

24.     Proskauer touts each of the Individual Defendants as experts in their respective fields of practice.  Proskauer represents that it has a highly sophisticated tax practice, staffed with "valued advisors in all aspects of tax law" who know "the latest laws, regulations, decisions and trends in this ever-changing area" and are able to help clients achieve their business goals. Mr. Parnes is the leader of Proskauer's New York tax team.

25.     Proskauer also represents that its tax department "is bolstered by commercial lawyers with high tax competency," such as Peter Samuels and Steven Weise.  According to a Proskauer press release issued at the time he joined the firm in 2008, Mr. Weise in particular is represented to be a leading authority on the Uniform Commercial Code, general contract law, e-commerce and legal opinion letters.  He was awarded the Lifetime Achievement Award from the American Bar Association's Uniform Commercial Code Committee.  Proskauer boasts that Mr. Weise "is part of an international group of leading secured transactions scholars and practitioners that has drafted a guide for secured transactions."  Mr. Weise also was named a New York "Super Lawyer" in 2010, 2011, and 2012.  Mr. Samuels was named "Dealmaker in the Spotlight" by *American Lawyer* in 2010.

26.     Richard H. Rowe is a partner in Proskauer's Washington D.C. office where his practice focuses primarily on corporate governance and regulatory matters.  Proskauer represents Mr. Rowe to be a "nationally recognized authority on securities law."  Prior to joining Proskauer, Mr. Rowe worked at the Securities and Exchange Commission for several years in a variety of

positions including Director of the Division of Corporate Finance. He has also been named a

Washington D.C. "Super Lawyer" since 2010 and one of the "Best Lawyers in America" each

year since 1993.

27.     Proskauer and OSG had a long relationship dating back to OSG's creation in

1969.  Proskauer Partner Stanley Komaroff sat on OSG's Board of Directors from 1993 until

2012.  OSG engaged Proskauer for a variety of legal services over the course of many years.

Proskauer was OSG's principal law firm from the Company's inception.  Proskauer represented

OSG on a wide range of matters, including mergers and acquisitions, commercial financing

matters, environmental and regulatory matters, and SEC disclosure matters.  Proskauer was

OSG's principal tax advisor at all relevant times until Proskauer was terminated by OSG in 2012.

Since at least as early as 2000 and up until OSG terminated Proskauer in 2012, Parnes

continuously represented OSG on tax and tax planning issues related to the U.S. taxation of

foreign shipping income, and other issues related to international taxation.  OSG regularly

consulted Parnes and Proskauer for advice in this area of the tax law.  At all relevant times,

Proskauer was also OSG's principal advisor on regulatory matters - particularly SEC and other

regulatory disclosure issues - until Proskauer was terminated by OSG in 2012.

C.     OSG's 2000 and 2001 Credit Agreements

28.     Prior to 2000, OSG and its related entities were financed primarily through

unsecured revolving credit facilities under which OSG, OBS, and OIN were each several

borrowers.  Although OSG guaranteed all the debt, OIN and OBS were liable under the pre-2000

credit facilities only for the monies they each borrowed directly.  Proskauer served as primary

outside counsel on OSG's 1994 and 1997 unsecured credit agreements, which contained this

"several" borrowing structure.  In OSG's 2000 credit agreement, the structure of the credit

facility changed.  The 2000 agreement for the first time provided that each of the three borrowers

- OSG, OBS, and OIN - were borrowing "jointly and severally," a departure from OSG's previous "several" agreements. Proskauer represented OSG and its subsidiaries in negotiating and drafting the 2000 credit facility.

29.     Proskauer was again engaged by OSG in connection with another credit agreement in 2001. The same joint and several structure was used in the 2001 facility.

**D.      Section 956 and the Tax Issues Related to OSG's Foreign Shipping Operations[3]**

30.     The U.S. tax treatment of foreign shipping income earned by foreign subsidiaries of U.S. corporations ("Controlled Foreign Corporation" or "CFC") changed significantly between 1969 and 2005. At all relevant times, OIN was (and still is) a controlled foreign corporation of OSG.

31.     From 1969 through 1975, OIN's foreign shipping income was not subject to U.S. income tax until such earnings were distributed or deemed distributed to OSG. Accordingly, as long as OIN retained its foreign shipping income, that income was not subject to U.S. tax. In 1975, the law was amended to provide that OIN's undistributed foreign shipping income would be taxed to OSG on a current basis except to the extent that OIN reinvested the income in its foreign shipping operations. After this change, OSG, like most other U.S. corporations with substantial foreign operations, took great care to stay within the reinvestment safe harbor and keep OIN's earnings exempt from U.S. tax.

32.     With the passage of the Tax Reform Act of 1986, the foreign shipping income reinvestment safe harbor was repealed, and thus all of OIN's foreign shipping income became

---

[3]  The following discussion of Subpart F of the Internal Revenue Code is not intended as a technical treatise of all of the nuances of U.S. taxation of foreign shipping income. Rather, the discussion is intended to provide the reader with an overview of the basic principles of tax law relevant to this Adversary Complaint in order to understand the claims asserted herein.

taxable to OSG in the year in which it was earned without regard to whether the income was actually distributed to OSG or reinvested by OIN in its foreign operations. As a result, distributions of OIN's post-1986 foreign shipping income to OSG did not give rise to additional U.S. tax liability because those earnings had already been taxed to OSG in the year they were earned by OIN.

33.     However, Section 955 allowed foreign shipping income earned by OIN between 1975 and 1987 which had been reinvested in its foreign shipping operations (and thus had qualified for the reinvestment safe harbor and was not taxed to OSG) to continue its exemption from U.S. tax (i) unless OIN's investment in qualified foreign shipping operations decreased from the level as of December 31, 1986 (whereupon a portion of OIN's foreign shipping income earned between 1975 and 1987 corresponding to the investment decrease became taxable), or (ii) until the earnings were distributed or deemed distributed to OSG. As of December 31, 1986, OIN had more than $400 million of "reinvested" earnings and profits that were exempt from U.S. taxation. OSG was aware of the tax safe harbor created by Section 955 and monitored it with the intention that these earnings remained legally "offshore." As stated in its public filings with the SEC, OSG's intent at all times was to take such actions as were necessary to avoid U.S. taxation of OIN's pre-1987 earnings "indefinitely."

34.     In 2004, Congress passed the American Jobs Creation Act which reinstated the general rule that the foreign shipping income of a CFC was not taxable to its U.S. parent until those earnings were distributed or deemed distributed to the U.S. parent. Accordingly, since January 1, 2005, none of OIN's foreign shipping income has been subject to U.S. tax unless it has been actually distributed to OSG in the form of a dividend, or deemed distributed under Section 956. As OSG's Form 10-K's have reported each year, "[t]he Company intends to

permanently invest [OIN's foreign shipping income] * * * in foreign operations." In accordance with this publicly stated policy, and consistent with its history of keeping OIN's pre-1987 earnings offshore and exempt from U.S. taxation, OSG's intent has been to make sure OIN's post-2004 foreign shipping income was not repatriated to the U.S. in a manner making it subject to tax, and OSG was doing just that, or at least so it thought.

35.     Congress had long been concerned that the tax rules under which foreign earnings (including qualified foreign shipping income) would not be subject to U.S. taxation until those earnings were repatriated in the form of dividends could be abused by a foreign subsidiary making its earnings available to the U.S. parent without actually paying a dividend as a corporate law matter (for example, an upstream loan from a foreign subsidiary to its U.S. parent). As a result, in 1962 Congress enacted Section 956 which was designed to prevent a U.S. parent company from obtaining the benefit of the untaxed earnings of its foreign subsidiaries without paying tax on those earnings. Under Section 956, a CFC's earnings will be deemed to have been distributed to its U.S. parent under certain circumstances functionally equivalent to a dividend distribution. The Internal Revenue Code and regulations thereunder specifically define such circumstances in broad terms, expressly including loans, guarantees, asset pledges, and other *direct or indirect* arrangements where the assets of the foreign subsidiary are used to support the obligations of the U.S. parent.

36.     Because Section 956 is intended to replicate the tax treatment of actual dividend distributions, liability under Section 956 generally will arise only to the extent the foreign subsidiary has current or accumulated earnings that have not already been subject to U.S. taxation. For example, if a foreign subsidiary guarantees a borrowing by its U.S. parent, the amount of the resulting Section 956 income inclusion in a particular year is a function of the

principal amount of the parent's obligation (determined, if the obligation is not outstanding for the entire year, on the basis of average quarterly balances), limited by the subsidiary's current or accumulated earnings and profits, and reduced by any portion of those earnings and profits that constitutes income that has been previously taxed in a prior year but not actually distributed to the U.S. parent.

E.    **The Interplay of Section 956 with OSG's 2000 and 2001 Credit Agreements**

37.    At the time Proskauer was representing OSG in connection with the 2000 and 2001 credit agreements, OIN had more than $400 million of pre-1987 earnings and profits that was not subject to U.S. taxation.  That amount had remained unchanged after December 31, 1986 because after that date all of OIN's current foreign shipping income had been included on OSG's annual tax returns and subjected to U.S. tax, and therefore OIN was not accumulating any additional untaxed earnings and profits.  Thus, for 14 years OSG had access to OIN's *current* earnings without having to worry about Section 956 inclusion because OSG was paying U.S. income tax on OIN's foreign shipping income during each of those years.  However, OSG still risked Section 956 liability for any deemed distributions of OIN's untaxed pre-1987 earnings and profits.

38.    Proskauer, as OSG's counsel on the 2000 and 2001 credit agreements, was aware of the change in these agreements that made OSG, OIN, and OBS joint and several borrowers. Under Section 955, in order to maintain the tax exempt status of OIN's pre-1987 untaxed earnings and profits, it was important for OSG to maintain OIN's investment in its foreign shipping operations at its December 31, 1986 level.  However, Proskauer never advised OSG that the new joint and several structure could result in a substantial Section 956 tax liability (because the joint and several structure was tantamount to a guarantee by OIN of borrowings by OSG) related to OSG's pre-1987 accumulated earnings and profits.

39.     Proskauer should have identified and advised OSG of the significant actual and potential tax consequences of the new joint and several arrangement in the 2000 and 2001 credit agreements, but it failed to do so.  This failure constituted professional negligence on the part of Proskauer.  Had Proskauer advised OSG of the tax consequences of the joint and several structure of the credit facilities in 2000 and 2001, OSG could have and would have negotiated an alternative structure with its lenders and thus avoided the otherwise completely avoidable taxation of OIN's pre-1987 earnings to OSG.  In addition, OSG would have been alerted to the Section 956 issue as it related to the joint and several structure generally, and could have avoided the perpetuation of the problem in its subsequent credit facilities.

**F.     OSG's Post 2001 Credit Agreements and the 2005 Check-the-Box Elections**

40.     OSG subsequently entered into several additional unsecured credit facilities between 2003 and 2006.  OSG negotiated and documented the 2003 through 2005 credit agreements in-house.  Although Proskauer did not represent OSG in connection with the negotiation and documentation of these credit agreements, Alan Parnes at Proskauer continued throughout this time period to be OSG's principal tax advisor, including with respect to ongoing issues related to foreign shipping income taxation and Section 956.  Moreover, OSG used the 2000 and 2001 credit agreements drafted by Proskauer as templates for the 2003 to 2006 credit agreements, all of which were structured nearly identically to the 2000 agreement.  In early 2006, OSG, OBS, and OIN entered into a $1.8 billion unsecured credit facility (subsequently reduced to $1.5 billion), again using the same joint and several structure OSG had used since 2000, based upon the original advice of Proskauer.  During this time period, Proskauer advised OSG on its SEC filings, including the Company's annual Forms 10-K. Copies of OSG's credit agreements were attached to the Forms 10-K.

41.     The passage of the American Job Creation Act of 2004 was a significant event for OSG because it reinstated the general rule that the foreign shipping income of a CFC was not taxable to its U.S. parent until those earnings were distributed or deemed distributed to the U.S. parent. The Company had lobbied for its enactment. The new Act provided OSG with new planning opportunities resulting from the change in tax law. Although Parnes and Proskauer advised OSG extensively with respect to planning opportunities resulting from the change in tax law, they never advised OSG that the change in law had the effect of increasing the potential adverse tax consequences of the joint and several structure of the Company's credit agreements. In giving this advice, Proskauer apparently never bothered to look at any of OSG's post-2001 credit agreements until Proskauer was engaged to represent OSG in connection with a new unsecured credit facility in 2011, even though Proskauer was aware of the joint and several structure used in the 2000 and 2001 credit agreements.

42.     From 2000 to 2004 OIN itself did not generate significant earnings. The vast majority of the earnings from OIN's international operations was generated in and isolated in OIN's lower-tier operating subsidiaries. Accordingly, the overwhelming majority of the tax liability under Section 956 due to OIN's joint and several liability under the post-1999 credit agreements would have been limited to the untaxed earnings and profits at the OIN level. The substantial untaxed accumulated earnings and profits at the level of OIN's lower-tier subsidiaries would not have been included in the calculation of the amount of the Section 956 inclusion.

43.     In early 2005, however, Parnes advised OSG to make certain tax elections under the Internal Revenue Code, commonly known as "check-the-box elections," to disregard many of OIN's foreign subsidiaries for U.S. income tax purposes. Insofar as is relevant to this case, one

effect of these elections was to disregard the foreign subsidiaries as separate entities for U.S.

income tax purposes and, in effect, treat OIN and its subsidiaries as a single taxpayer.

44.    In a March 3, 2005 memorandum to OSG's Controller, Parnes advised that the

elections would allow a "free flow of cash between [OSG's] foreign subsidiaries without U.S.

tax consequences," since if the elections were not made "dividends received from or interest paid

or received by foreign ship owning subsidiaries w[ould] continue to be Subpart F income to the

foreign recipients." Thus, all of the tax attributes of OIN's lower-tier subsidiaries became

attributable to OIN.

45.    A corollary effect of the elections, however, was that the considerable untaxed

accumulated earnings and profits of OIN's lower-tier subsidiaries were treated for tax purposes

as though they were OIN's accumulated earnings and profits. Since untaxed accumulated

earnings and profits is the metric used to measure the taxable amount of a deemed distribution

includible under Section 956, the overall result of these elections was to exponentially increase

OSG's income tax liability under Section 956 because of the joint and several structure of the

Company's credit agreements. Most of this liability could have been avoided entirely either by

not making the check-the-box elections and retaining earnings at the level of OIN's lower tier

subsidiaries or by not entering into a loan agreement that had the joint and several structure.

46.    Nowhere in his recommendation memo or elsewhere did Parnes advise OSG to

review the Company's existing credit agreements and other contracts to ensure that the check-

the-box elections did not pose any negative tax consequences for those transactions. Nor did

Parnes undertake to perform that exercise himself. Incredibly, Parnes never even looked at any

of OSG's credit agreements in connection with the check-the-box elections, even though

Proskauer had drafted the joint and several structure in the first instance. Accordingly, the

check-the-box elections resulted in the sudden addition of at least $1.0 billion of untaxed

accumulated earnings and profits in OIN that subsequently became subject to U.S. income tax

liability under Section 956 because of OIN's joint and several liability under the credit

agreements.[4] No one at OSG had any knowledge of the tax liability resulting from Proskauer's

advice on the check-the-box elections.

47.     Parnes should have reviewed (or at least advised OSG to review) OSG's existing

credit agreements and other contracts for any tax consequences resulting from the check-the-box

elections, but he failed to do so.  This failure constitutes professional negligence on the part of

Parnes and Proskauer.  Had Parnes reviewed the credit agreements, (i) he would have discovered

the joint and several tax issue in early 2005 in time for OSG to substantially ameliorate it or

eliminate it entirely, and (ii) OSG could have deferred making the check-the-box elections that

greatly increased OSG's exposure to tax liability under Section 956 until the problem was

corrected.

## G.     OSG's 2011 Forward Start Facility and Discovery of the Joint and Several/Section 956 Issue

48.     In late 2010 and early 2011, OSG began working on a new unsecured credit

facility that would begin in 2013 once the 2006 agreement had matured ("Forward Start

Facility").  OSG engaged Proskauer to represent OSG in connection with this agreement.  Peter

Samuels was the Proskauer partner with principal responsibility for the OSG relationship.  Ron

Franklin, a partner in Proskauer's finance group, played a lead role in connection with the

Forward Start Facility.

---

[4] Once OIN's foreign shipping income became taxable to OSG under Section 956, OSG was required to recognize such income on its own return and pay taxes on that income at OSG's highest marginal income tax rate, generally about thirty-five (35%).

49.     The structure of the draft Forward Start Facility followed the form of OSG's credit agreements since 2000, including the joint and several language.  In April 2011, very near the end of the negotiations, Parnes was asked to review a draft of the Forward Start Facility. Parnes immediately recognized that the joint and several language had the practical effect of creating an "upstream guarantee" of OSG's borrowings by OIN for purposes of Section 956, which in turn created a serious tax problem for OSG.  Parnes immediately advised Samuels of the problem.

50.     Parnes then called OSG's general counsel, James Edelson ("Edelson"), and informed him that Proskauer was concerned that the joint and several structure "might" be treated as an upstream guarantee for tax purposes, thus implicating a Section 956 tax liability, and Proskauer wanted to consider the issue.  Edelson immediately informed Controller Jerry Miller ("Miller"), Chief Risk Officer Janice Smith ("Smith"), andVice President of Corporate Development and Finance Erik Broekhuizen ("Broekhuizen") of Parnes' call.  Edelson spoke with Chief Financial Officer Myles Itkin ("Itkin") the next day.  Itkin promptly informed Chief Executive Officer Morton Arntzen ("Arntzen") of the potential tax issue.

51.     Shortly after speaking to Arntzen, Itkin spoke to Samuels and conveyed that OSG needed to fully understand the potential issue.  By this time Parnes had already researched the tax issue and unknown to OSG had informed Samuels that there was "no tax solution" - that is if OIN was jointly liable for OSG's borrowings under the terms of the credit agreements, the borrowings would be deemed to be distributions to OSG under Section 956, and, therefore, subject to U.S. taxation.  Parnes' conclusion was not conveyed to OSG by Samuels; instead, OSG was left with the prior understanding conveyed by Proskauer that Proskauer was analyzing the issue.

52.    Within a few days of the call between Samuels and Itkin, Samuels called Itkin and communicated that Proskauer did not believe the joint and several language was an issue. Although Parnes had already determined that there was "no tax solution to the problem," Proskauer internally concluded that the only way to resolve the issue to its satisfaction was to analyze it as a matter of contract interpretation.

53.    Samuels organized a team of commercial lawyers, headed by Steven Weise, to analyze OSG's credit agreements for evidence of the parties' intent.  Proskauer asked OSG to look for files relevant to the drafting of the 2000 credit agreement where the joint and several structure was first used.  OSG reported that it could not find anything, and the only relevant document Proskauer could locate was an obscure time entry in its billing files.

54.    There was no reason for Proskauer to be researching in 2011 what anyone thought or said about the joint and several provision in 2000-2001 except to explore how it had failed to identify and convey to OSG any adverse tax consequences flowing from the joint and several language back in 2000-2001.  The bottom line is that a reasonably competent lawyer would have advised the client both in 2000-2001 and again in 2011 of the adverse tax consequences flowing from the joint and several language.  Proskauer failed in both instances to fulfill its duties.

55.    OSG received a first draft of Proskauer's tax opinion on May 9, 2011, which concluded that the joint and several language did not obligate OIN to repay OSG's borrowings, and thus should not be construed to provide impermissible credit support that would give rise to a deemed dividend from OIN to OSG under Section 956.

56.    Proskauer's conclusion was based primarily on the legal conclusion that the joint and several language in OSG's post-1999 credit agreements was ambiguous (i.e., that the language "joint and several" did not necessarily obligate OIN to repay the borrowings of OSG,

but was in fact susceptible to more than one reasonable interpretation).  Having concluded that

the language was ambiguous, Proskauer then concluded that it was clear, based on parol

evidence, that it was never the parties' intention for OIN to be liable for the borrowings of OSG

and OBS.  The draft did not identify as risks that Parnes had concluded that there was "no tax

solution" to the issue, or that the "joint and several" language was clear and unambiguous

rendering parol evidence irrelevant.

57.    On its face, Proskauer's tax opinion was authoritative and seemingly well-

researched.[5]  Nevertheless, OSG did not blindly accept Proskauer's advice without question.

Rather, OSG's senior management critically vetted Proskauer's draft opinion, asked questions,

and engaged Proskauer in numerous discussions about its analyses of the issues.  At the

conclusion of this process, OSG management was satisfied that it could rely on Proskauer's

analyses and conclusions which did not change throughout this process.

58.    On May 23, 2011, Proskauer sent a revised draft of its opinion to OSG that

contained two substantive revisions.  First, Proskauer added a footnote that read "It seems clear

from our time records that the issue of the tax implications of the joint and several language of

the credit agreement was identified during the 2000 loan negotiations and discussed not only

internally at Proskauer and with OSG, but also with counsel to the lenders."  In Proskauer's

view, specifically represented to OSG in Proskauer's opinion, the time entries showed that

evidence from Proskauer's own files supported the conclusion that the parties had not intended

joint and several liability for OIN under the 2000 agreement.  Thus, unknown to OSG at the

time, by its own admission Proskauer advised or allowed its client to sign what it now claims is

---

[5]  The draft opinion was 19 pages including the appendix, and contained 51 footnote citations to case law, secondary source authorities, the Internal Revenue Code and the *Restatement of Contracts 2d.*

an ambiguous series of agreements, and, at a minimum, Proskauer knew or should have known that the client would suffer devastating tax consequences if the so-called "ambiguity" was resolved against OSG. In any event, as OSG eventually learned after receiving its client files from Proskauer in early 2013, the tax opinion vastly overstates the clarity and relevance of the time records referenced in Proskauer's opinion.

59.     Second, Proskauer added to the draft the argument that the credit agreements lacked the standard waiver language one would expect to see in a guarantee as support for Proskauer's interpretation that there was no intent for OIN to guarantee the borrowings of OSG. OSG entered into the Forward Start Facility on May 26, 2011, to be effective on February 8, 2013, the date the 2006 credit facility expired.

60.     On June 1, 2011, Proskauer sent OSG its "final" tax opinion ("June 2011 Tax Opinion Memorandum"). The final version of the opinion did not differ materially from the May 23 draft. Proskauer's conclusions in the memorandum were unqualified and unequivocal. OSG's senior management had a high degree of confidence in Proskauer's performance and integrity, and no member of OSG senior management pressured Proskauer to arrive at any particular result. Senior management was comfortable with and relied upon Proskauer's analysis and advice contained in the June 2011 Tax Opinion Memorandum on the joint and several issue.

61.     By the time OSG received the first draft of Proskauer's tax opinion on May 9, 2011, and given Proskauer's advice that there was not a tax problem, OSG determined that it was not necessary or commercially reasonable to renegotiate the Forward Start Facility to address the joint and several/Section 956 issue, although it could have and would have if Proskauer had advised OSG, as it should have, that the joint and several language triggered deemed dividends under Section 956.

62.     In reliance on Proskauer's oral and written advice, OSG executed the Forward Start Facility with the joint and several structure.  In addition, in reliance on Proskauer's advice OSG did not reexamine any of the draws it had taken since 2000 under its earlier "joint and several" credit agreements, and particularly the existing 2006 credit facility, to determine if the Company had any Section 956 exposure.  Proskauer understood that if the earlier "joint and several" credit facilities were deemed to obligate OIN for all of OSG's borrowings, the Section 956 tax liability would be in the hundreds of millions of dollars.

63.     Following Proskauer's issuance of its June 2011 Tax Opinion Memorandum, Proskauer, OSG Chief Risk Officer Smith, General Counsel Edelson, and Controller Miller were involved in discussions regarding whether the tax issue and Proskauer's advice should be disclosed to OSG's Board, Audit Committee, and independent auditors, PricewaterhouseCoopers ("PwC").  Samuels advised Smith and Edelson that it was not necessary to inform the Board, the Audit Committee, or PwC about the issue.  Edelson and Smith reasonably relied on Proskauer's advice regarding disclosure.  In a subsequent telephone call, Samuels and Proskauer SEC Partner Richard Rowe ("Rowe") advised Miller, Edelson and Smith that it was not necessary to provide Proskauer's opinion to the Audit Committee or the Board.

64.     Based upon Proskauer's advice that disclosure was not required, OSG management did not disclose the tax issue regarding the joint and several language and Proskauer's resolution of the issue to OSG's Board of Directors, the Audit Committee, the independent auditors, or to regulators.

65.     Proskauer's advice to OSG that the joint and several language in its credit agreements did not obligate OIN to repay OSG's borrowings, and thus did not create a taxable deemed dividend from OIN to OSG under Section 956, was dead wrong.  Among other things,

Proskauer's legal conclusion that the joint and several language in OSG's post-1999 credit agreements is ambiguous (i.e., that the language "joint and several" did not mean OIN was jointly and severally liable for the borrowings of OSG) was dead wrong. This wrong advice constitutes professional negligence on the part of Proskauer.

66.    Had Proskauer properly advised OSG of the tax consequences of the joint and several structure of the credit facilities in 2011 and 2012, OSG could have and would have completely avoided the Section 956 inclusion tax resulting from its post-May 2011 drawdowns on its existing credit facility. Proskauer's negligent advice to OSG in 2011 and 2012 concerning the interpretation of the credit agreements and their resulting adverse tax effects to OSG was a direct and proximate cause of damages OSG seeks to recover herein. In addition, Proskauer's improper advice to OSG management that it was not necessary for OSG's management to disclose the potential tax issue to OSG's Board, Audit Committee, independent auditors, or the regulators, deprived the Board of the opportunity to assess the issue for itself until the Board was first advised of the issue on September 20, 2012.

## H.    Reemergence of the Section 956 Issue

67.    In late 2011, OSG determined that it needed to provide for future financing in addition to the Forward Start Facility, and in order to do so that it needed to renegotiate with its lenders under that facility ("FSF Lenders"). Proskauer represented OSG in the renegotiation, and negotiated directly with counsel for the FSF Lenders. OSG's proposed transaction with the FSF Lenders included a pledge of certain assets of OIN. This led to a discussion with the lenders and their counsel regarding the need to structure the new credit agreement so that the pledge of OIN assets did not trigger Section 956. In the course of these discussions, the FSF Lenders and their counsel began to raise questions about why the joint and several structure of OSG's prior credit facilities did not raise an issue under Section 956.

68.     On July 10, 2012, the FSF Lenders' counsel sent e-mails to OSG expressing concern that "an arrangement whereby OSG, Inc. (a U.S. entity) and OSG International, Inc. (a CFC) are co-borrowers under a loan agreement could trigger a U.S. tax issue under Section 956." The FSF Lenders' counsel sent a follow-up email two days later requesting a call on "diligence issues." These inquiries from the FSF Lenders' counsel arrived at the same time OSG was considering drawing down the remaining funds available on the 2006 credit facility. Samuels advised OSG not to respond and that he would handle it.

69.     Negotiations with the FSF Lenders over amending the Forward Start Facility had become more contentious over the summer of 2012. At one point, OSG perceived that one of the FSF Lenders threatened not to honor a drawdown on the 2006 credit facility if OSG did not capitulate on the FSF Lenders' demands for greater security with respect to the Forward Start Facility amendment. In light of this perceived threat, OSG decided to draw down the remainder of the funds available under the facility. OSG viewed Proskauer's opinion on the joint and several/Section 956 issue as critical to the decision to drawdown on the 2006 revolver.

70.     A day or two before the July 16, 2012 drawdown, there was a conference call among OSG senior management, Samuels, and Proskauer bankruptcy partner Scott Rutsky ("Rutsky"), among others, to discuss the drawdown. OSG CFO Itkin asked to have the call because, among other things, there were representations in the drawdown certificate that he and OSG CEO Arntzen had to sign, and Itkin wanted to be certain that the representations were accurate. Itkin was aware that the FSF Lenders' counsel had raised the joint and several/Section 956 issue just a few days earlier, and he wanted to be sure that Proskauer's advice had not changed.

71.     Among the topics of discussion was CEO Arntzen's question to Samuels whether OSG could still rely on Proskauer's prior advice (which Itkin, Arntzen, and Proskauer understood included the June 2011 Tax Opinion Memorandum) in anticipation of the drawdown. Samuels confirmed to Itkin and Arntzen that OSG could unequivocally rely on Proskauer's prior advice. Proskauer again failed to identify as a risk that Parnes had concluded that there was "no tax solution" to the joint and several/Section 956 issue.

72.     In reliance on Proskauer's advice in the June 2011 Tax Opinion Memorandum, OSG drew down the remaining $343 million on the 2006 credit facility on July 16, 2012.  The drawdown notice was signed by Arntzen and Itkin.  This drawdown increased the balance on the 2006 credit agreement to nearly the $1.5 billion limit.  From June 1, 2011 - the date on which Proskauer provided its final opinion on the joint and several/Section 956 issue - until the drawdown of all funds under the 2006 credit agreement on July 16, 2012 - OSG took $659 million in net drawdowns under its 2006 credit agreement in reliance on Proskauer's advice on the joint and several/Section 956 issue.  Had Proskauer's advice on the critical joint and several/ Section 956 issue not been negligent, OSG could have and would have avoided the Section 956 tax liability on these drawdowns.

73.     After the July 16 drawdown, the FSF Lenders and their counsel continued to express concern about the joint and several structure.  On September 7, 2012, the FSF Lenders' counsel sent another email expressing Section 956 concerns with the joint and several structure.

74.     In response to this email, there was a flurry of internal Proskauer emails among Samuels, Weise, Parnes, and others about "the sleeping dog awakening" and providing an "ambiguous" response to the FSF Lenders' counsel.  On September 14, 2012, Samuels, Parnes, Franklin and Weise met with the FSF Lenders' counsel to walk them through OSG's position

(based on the June 2011 Tax Opinion Memorandum) on the joint and several/Section 956 issue. Shortly after this meeting, the negotiations between OSG and the FSF Lenders broke down completely.

75.     During the period August through October 2012, Proskauer was revisiting and adding to its original 2011 research on the joint and several/Section 956 issue.  Proskauer's ultimate opinion – that the joint and several language did not create a Section 956 tax issue for OSG – was reiterated numerous times to OSG and its representatives by Proskauer without qualification.

**I.     The September 20, 2012 Board Meeting and its Aftermath**

76.     At the September 20, 2012 meeting of OSG's Board of Directors, Parnes and Samuels disclosed the joint and several/Section 956 issue to the Board for the first time.  All of the Board members expressed surprise and concern that neither the full Board nor the Audit Committee had been told of the issue when it first arose.  Samuels confirmed to the Board that Proskauer's advice to management had been that disclosure of the issue to the Board and to the auditors was not necessary.  Samuels also told the Board that he had walked through these issues with Proskauer partner Richard Rowe, who had concurred that there was no obligation for OSG to report this matter to the SEC or the independent auditors.  The Board set up another meeting so that Proskauer could further explain its advice on the joint and several/Section 956 issue in greater detail.

77.     Proskauer partners Samuels, Weise, Rowe, Parnes and Rutsky attended a telephonic board meeting on September 30 with the OSG directors and senior OSG management. At the meeting, Parnes discussed in detail the history of Section 956 and the joint and several/Section 956 issue.  He explained that this only became an issue for the Company in 2008

when OSG's borrowings under the 2006 credit agreement rose to the level that all of OIN's previously taxed income was consumed, and thus Section 956 inclusion was triggered.[6]

78.     Samuels reaffirmed to the Board that Proskauer's opinion expressed in the June 2011 Tax Opinion Memorandum was a "strong should opinion" that could be relied upon without reservation.  He also stated that Proskauer was willing to "stake its reputation" on the conclusion in the memo.  Rowe also reconfirmed that management had not needed to disclose the issue in 2011, as the matter had never been raised in twelve years and he claimed that other experts had reviewed the agreements in detail and not raised the issue.  At this meeting, the Board asked management and Proskauer to meet with OSG's outside auditors, PwC.

79.     The PwC meeting was set for October 2, 2012.  Rowe, Parnes, Weise and Samuels attended the meeting on behalf of Proskauer. CEO Arntzen, CFO Itkin, Controller Miller and CRO Smith attended on behalf of OSG.  Three representatives of PwC were present: the head of PwC's New York office, a tax partner, and the partner in charge of PwC's OSG audit team.  At the meeting, Proskauer gave a presentation and overview of the issue and verbally walked PwC through Proskauer's June 2011 Tax Opinion Memorandum.  PwC inquired why this information had not previously been provided to PwC and the Audit Committee.  Miller told PwC that OSG had cleared with Proskauer that OSG did not need to disclose these issues to the Board, the Audit Committee, or to the Auditors.  None of the Proskauer partners in attendance disputed or contradicted Miller's statement.

80.     PwC had not seen Proskauer's June 2011 Tax Opinion Memorandum at the time of the October 2 meeting, but Proskauer provided the memo to PwC some time after the meeting.

---

[6] Parnes was mistaken about there being no potential missed tax liability in years prior to 2008 because, as set forth in greater detail in Section E above, there was a deemed distribution of OIN's untaxed pre-1987 accumulated earnings and profits in 2001 and 2002.

PwC then asked Proskauer to convert the tax opinion, which had been styled as a "memorandum," into a tax opinion letter in the form PwC was accustomed to receiving in connection with its audit work. On October 16, 2012, PwC sent an e-mail to OSG outlining the specifics of what needed to be in the tax opinion letter. Among those requirements was a statement that the opinion must be a "should" opinion, which in tax parlance means a 70% degree of comfort. In addition, PwC was requiring that OSG obtain independent counsel to review Proskauer's June 2011 Tax Opinion Memorandum and provide a second opinion.

81.    Proskauer began work to convert the June 2011 Tax Opinion Memorandum to a formal tax opinion. On October 18, 2012, Proskauer sent a draft tax opinion letter to OSG in which Proskauer continued to support its previous conclusion that the joint and several structure did not trigger Section 956 tax liability for OSG. Proskauer, however, never finalized and issued this tax opinion letter.

82.    On or about October 19, 2012, CEO Arntzen informed Proskauer that OSG was not going to retain Proskauer to represent OSG in connection with a potential bankruptcy proceeding. On October 22, 2012, OSG filed a Form 8-K with the SEC stating that its financial statements for its last three fiscal years could no longer be relied upon and that the Company was in the process of reviewing a tax issue in connection with its credit agreements arising from its international operations. This Form 8-K effectively constituted OSG's repudiation of Proskauer's tax advice on the joint and several/Section 956 issue.

83.    In late October 2012, OSG provided Proskauer with documents relating to the negotiation and drafting of the 2000 credit agreement which OSG had previously been unable to locate. There was nothing in the documents reflecting that Proskauer advised OSG of the

negative Section 956 tax consequences attendant with the joint and several structure of the 2000

credit agreement.

84.     OSG filed for relief under Chapter 11 of the U.S. Bankruptcy Code on November

14, 2012.

85.     After the Chapter 11 filing, OSG self reported to the Internal Revenue Service

that certain of OSG's tax returns were incorrect due to the joint and several/Section 956 issue.

As a result, OSG expects to pay hundreds of millions of dollars in U.S. income taxes which it

would not otherwise have to pay had Proskauer provided OSG with sound advice on the joint

and several/Section 956 issue.  In addition, as a direct result of Proskauer's negligent advice,

OSG has incurred millions of dollars in connection with the restatement of its prior financial

statements, collateral litigation and its bankruptcy proceeding, the recovery of which is sought

herein.  On February 11, 2013, the Internal Revenue Service filed an amended claim in the OSG

bankruptcy proceeding claiming an income tax deficiency against OSG in the amount of

$463,013,177.63, largely based on the joint and several/Section 956 issue.

**J.      Proskauer's Continuous Representation of OSG**

86.      OSG asserts and invokes the application of the continuous representation doctrine

as to all claims for relief asserted herein for professional negligence, which tolls the limitations

period where an attorney continued to advise his client as to the matter giving rise to the

professional negligence claim.  Defendants Proskauer and Parnes were continuously engaged by

OSG since 2000 to assist and advise on tax and tax planning issues, including advice related to

the U.S. taxation of foreign shipping income, and particularly issues related to Section 956.  This

was not merely an ongoing relationship in which Parnes was occasionally asked to handle

specific transactions, but instead involved a constant engagement to advise the Company as to its

compliance with the international tax laws and planning opportunities or consequences resulting

therefrom.  At all relevant times, OSG relied on the guidance of Parnes and Proskauer, and depended upon them to appropriately advise the Company on any necessary actions.  Because the initial acts of professional negligence were part of this continuing representation, OSG could not have been expected to question the Defendants' techniques or advice and potentially jeopardize the ongoing relationship.

## IV. Claims for Relief

### A.    Count One - Legal Malpractice

87.    The Plaintiff incorporates paragraphs 1 through 86 into this claim for relief.

88.    As the Company's attorneys, the Defendants owed OSG a duty of care requiring them to act with a certain level of skill, prudence and diligence.  The Defendants breached that duty of care in the following ways, among others:

a.    failing to obtain a sufficient understanding of OSG's credit agreements and corporate structure in order to properly advise the Company on tax matters and identify the issue with the joint and several structure in previous years;

b.    misrepresenting that the term "joint and several" was ambiguous;

c.    failing to advise OSG of Parnes' conclusion that if "joint and several" means "joint and several" there was "no tax solution" to the Section 956 problem;

d.    misrepresenting that the "ambiguity" would be resolved by parol evidence in favor of there not being joint and several liability for OIN;

e.    misrepresenting that OIN was not jointly and severally liable for the debt;

f.    misrepresenting and failing to disclose properly OSG's tax liability;

g.   misrepresenting and failing to disclose properly the meaning, legal effect and tax consequences of OSG's credit agreements and the check-the-box elections;

h.   misrepresenting and failing to disclose properly all material facts concerning Proskauer's role in connection with OSG's credit agreements, the check-the-box elections and the resulting tax consequences;

i.   advising OSG to make the check-the-box elections;

j.   advising OSG not to make proper disclosures of the joint and several/Section 956 issue, the supposed ambiguity, the tax consequences of the joint and several language, and the check-the-box elections to OSG's Board of Directors, appropriate committees of the Board, independent auditors, the SEC, and the public;

k.   failing to take reasonable steps to assure that OSG made proper disclosures of the joint and several/Section 956 issue, the supposed ambiguity, the tax consequences of the joint and several language, and the check-the-box elections to the Board of Directors, appropriate committees of the Board, independent auditors, the SEC, and the public;

l.   failing to review the Company's credit agreements in connection with services rendered in preparation of its disclosures to the SEC, including the disclosures contained in the Company's annual reports on Form 10-K and quarterly reports on Form 10-Q, and to identify the tax risk related to the credit agreements in such disclosures;

m.     failing to properly review existing finance structures prior to recommending to OSG that it make the check-the-box elections which caused OIN's U.S. property to increase dramatically thus creating potential for Section 956 tax liability;

n.     failing to properly research and understand the tax laws relevant to the Company's credit agreements and failing to advise OSG after discovery of the tax problem with their joint and several structure; and

o.     failing to advise OSG to disclose the finding of a potential joint and several/Section 956 issue to its Audit Committee, Board of Directors, independent auditors, or the SEC upon its initial discovery;

89.     Each of these acts and omissions on the part of the Defendants constitutes a failure to exercise the appropriate level of skill, prudence, and diligence commonly used by attorneys specializing in tax, commercial and corporate law, and thus is a breach of the standard of care owed to OSG.

90.     Had the Defendants acted in conformity with the reasonable standard of care, they would have discovered the tax issue much earlier and taken the following actions, among others. In connection with their advice on the check-the-box elections, as well as the tax consequences and planning opportunities created by the American Jobs Creation Act, the Defendants would have reviewed the existing credit agreements and identified the joint and several/Section 956 issue at that time. The Defendants would have inquired as to the structure of those credit agreements prior to advising the Company to roll potentially large amounts of accumulated earnings and profits into OIN through check-the-box elections. The Defendants would have recommended against making the check-the-box elections. The Defendants would have

researched the tax laws more thoroughly in their analysis of the joint and several/Section 956

issue and properly advised OSG as to the broad interpretation standard applied by Section 956 in

relation to a foreign subsidiary's guarantees.  The Defendants would have recommended

disclosure of the potential tax issue to the Audit Committee, Board of Directors, the Company's

independent auditor, and the SEC as a prudent business decision.  Any one of these actions

would have resulted in greatly reduced damages to OSG.  The Defendants' conduct is a clear

departure from a reasonable standard of care and constitutes professional negligence.

91.     As a direct and proximate result of the Defendants' negligence, OSG suffered

significant damages in an amount to be proven at trial.

**B.     Count Two - Breach of Fiduciary Duty**

92.     The Plaintiff incorporates paragraphs 1 through 91 into this claim for relief.

93.     As OSG's attorneys, the Defendants owed OSG the duty to deal fairly and

honestly and with undivided loyalty.  The Defendants breached that duty by the following acts,

among others:

a.     protecting their own interests over their client's;

b.     failing to acknowledge and admit to the Defendants' previous failures to
review the Company's credit agreements and identify and give proper
advice concerning the joint and several/Section 956 issue in the course of
advising Plaintiff as to other matters such as the Company's disclosures to
the SEC, recommending check-the-box elections, and advising on tax
planning after the American Jobs Creation Act in 2004;

c.     formulating an elaborate, yet faulty, explanation of the joint and
several/Section 956 issue as one of contract interpretation rather than

          acknowledging the potential tax liability and advising OSG as to appropriate resolutions at that time;

d.      failing to admit to their own missed opportunities to identify and give proper advice concerning the joint and several/Section 956 issue and prevent increased exposure to tax liability through check-the-box elections in connection with its 2005 tax advice, and instead putting the Defendants' interests above OSG's by advising OSG to continue on in the same course; and

e.      failing to disclose that the firm's earlier malpractice in connection with its advice to the Company on the joint and several/Section 956 issue created a conflict of interest on the joint and several/Section 956 issue such that the firm could not offer OSG independent and unbiased advice.

94.     Each of the above acts constitutes a breach of the Defendants' fiduciary duty to its client OSG.

95.     Had the Defendants put OSG's interest above their own, they would have acknowledged the faulty advice previously given in 2000, 2001, 2005 and any subsequent year in which they should have identified and given proper advice concerning the issue. Instead of creating various arguments in an attempt to convince OSG they had previously given competent advice, the Defendants should have admitted to earlier mistakes and advised OSG as to the best course of action to prevent further damage.

96.     As a direct and proximate result of the Defendants' breach, OSG continued to incur additional damages of an amount to be proven at trial.

## V. Prayer for Relief

97.     For these reasons, OSG requests that the Court award it judgment against the

Defendants for:

      a.     actual damages in an amount to be proven at trial, including without limitation the entirely avoidable taxes OSG incurred as a result of the joint and several/Section 956 issue;

      b.     consequential damages in an amount to be proven at trial, including without limitation the expenses and losses OSG has suffered, and will continue to suffer, in connection with the restatement of its prior financial statements, collateral litigation and the filing of its bankruptcy;

      c.     prejudgment and post judgment interest as allowed by law;

      d.     return of any and all fees paid by OSG to Proskauer for the negligent services;

      e.     reasonable attorneys' fees and cost of court, and

      f.     any other relief allowed by law and deemed appropriate by the Court.

## VI. Jury Demand

98.     Plaintiff demands a jury trial in this matter.

THIS SPACE INTENTIONALLY LEFT BLANK

Respectfully submitted,

**GELLERT SCALI BUSENKELL & BROWN, LLC**


/s/ Michael G. Busenkell
Michael G. Busenkell (No. 3933)
913 N. Market Street, 10th Floor
Wilmington, DE  19801
Phone:  (302) 425-5812
Fax:  (302) 425-5814
mbusenkell@gsbblaw.com

and

**MULLIN HOARD & BROWN, L.L.P.**


John M. Brown, *admitted pro hac vice*
Texas State Bar Number 03142500
jmb@mhba.com
Steven L. Hoard, *admitted pro hac vice*
Texas State Bar Number 09736600
shoard@mhba.com
Flannery H. Nardone
Texas State Bar Number 24083183
fhoard@mhba.com
800 Amarillo National Plaza Two
500 South Taylor
P. O. Box 31656
Amarillo, Texas  79120-1656
Phone: (806) 372-5050
Fax: (806) 372-5086


Attorneys for Plaintiff